**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**Case No. 9:18–CV–81147–BLOOM–REINHART**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ISAC SCHWARZBAUM, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>DEFENDANT ISAC SCHWARZBAUM'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ............................................................................................................1

I.     FACTUAL BACKGROUND...................................................................................1

   A.   THE EARLY LIFE OF ISAC SCHWARZBAUM...............................................................1

   B.   THE ADULT YEARS OF ISAC SCHWARZBAUM.........................................................2

      1.   Isac's connection with the U.S. .......................................................................2

      2.   Advice Isac received from his Swiss father ....................................................2

      3.   Preparation of tax returns and FBARs ...........................................................2

   C.   IRS MATTERS .......................................................................................................5

      1.   IRS OVDI and Income Tax.............................................................................5

      2.   IRS Examinations ...........................................................................................5

II.    LEGAL BACKGROUND .........................................................................................6

   A.   THE BANK SECRECY ACT .....................................................................................6

   B.   LACK OF AWARENESS OF FBAR ...........................................................................7

ARGUMENT ................................................................................................................7

I.     ISAC WAS NOT WILLFUL......................................................................................7

   A.   WILLFUL STANDARD ............................................................................................8

   B.   ISAC WAS NOT WILLFUL UNDER THIS STANDARD .................................................9

      1.   Isac was not willful because he did not have actual knowledge ..................9

      2.   Isac's reliance on qualified certified public accountants disproves recklessness ......9

II.    THE IRS DETERMINATION SHOULD BE SET ASIDE UNDER THE APA..............10

   A.   THE IRS VIOLATED THE APA IN DETERMINING ISAC WAS WILLFUL.................10

   B.   THE IRS VIOLATED THE APA IN DETERMINING THE AMOUNTS OF PENALTIES ............12

   C.   THE FBAR PENALTIES VIOLATED THE APA BECAUSE THEY VIOLATED FINCEN REGULATIONS.............................................................................................13

   D.   THE FBAR PENALTIES VIOLATED THE APA BECAUSE THEY VIOLATED THE DUTY OF CONSISTENCY .......................................................................................15

III.   THE FBAR PENALTIES VIOLATE THE EIGHTH AMENDMENT ...........................16

   A.   THE FBAR PENALTIES ARE SUBJECT TO CONSTRAINTS OF EIGHTH AMENDMENT..........17

   B.   THE FBAR PENALTIES ARE GROSSLY DISPROPORTIONATE ............................17

IV.   THE FBAR PENALTY ASSESSMENTS AGAINST ISAC ARE TIME BARRED.......19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auer v. Robbins,*
519 U.S. 452 (1997)................................................................................................14

*Austin v. U.S.,*
509 U.S. 602 (1993)................................................................................................17

*Bedrosian v. U.S.,*
912 F.3d 144 (3d Cir. 2018)................................................................................8, 15

*Bonner v. City of Prichard,*
661 F.2d 1206 (11th Cir. 1981) ...............................................................................8

*Bowles v. Seminole Rock & Sand Co.,*
325 U. S. 410 (1945)...............................................................................................14

*Clark County v. FAA,*
522 F.3d 437 (D.C. Cir. 2008) ...............................................................................12

*Davis v. U.S.,*
No. 16-CR-80004, 2018 WL 1136612 (S.D. Fla. Mar. 1, 2018)............................16

*Eberhardt v. Waters,*
901 F.2d 1578 (11th Cir. 1990) ...............................................................................7

*Fargo v. Comm'r.,*
447 F.3d 706 (9th Cir. 2006) .................................................................................13

*Hom v. U.S.,*
No. C 13-02243 WHA, 2013 WL 5442960 (N.D. Cal. Sept. 30, 2013)............15, 16

*Kimble v. U.S.,*
141 Fed. Cl. 373 (2018) .........................................................................................14

*Kisor v. Wilkie,*
139 S.Ct. 2400 (2019).......................................................................................13, 14

*Malloy v. U.S.,*
17 F3d 329 (11th Cir. 1994) .....................................................................................8

*Mazo v. U.S.,*
591 F.2d 1151 (5th Cir. 1979) ..................................................................................8

*Moore v. U.S.*,
    No. C13-2063RAJ, 2015 U.S. Dist. LEXIS 43979 (W.D. Wash. Apr. 1, 2015)..............10, 17

*Nat'l Ass'n of Home Builder*,
    340 F.3d 835, 841 (9th Cir 2003) ........................................................................................10

*Norman v. U.S.*,
    138 Fed. Cl. 189, 195 (2018) ...............................................................................................14

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)..................................................................................................................8

*Scott v. U.S.*,
    No. 17-13741, 2019 WL 2451049 (11th Cir. June 12, 2019)..................................................8

*Thosteson v. U.S.*,
    331 F.3d 1294(11th Cir. 2003) ...............................................................................................8

*U.S. v. Bajakajian*,
    524 U.S. 321 (1998)......................................................................................................17, 18

*U.S. v. Boyd*,
    123 A.F.T.R. 2d 2019-1651 (CD CA 2019) ..........................................................................18

*U.S. v. Bussell*,
    No. CV 15-02034 SJO (VBKx), 2015 U.S. Dist. LEXIS 175952 (C.D. Cal.
    Dec. 8, 2015).................................................................................................................17, 18

*U.S. v. Colliot*,
    No. AU-16-CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018) ...................14, 15

*U.S. v. Flume*,
    No. 5:16-cv-73, 2018 WL 4378161 (S.D. Tex. 2019)........................................................8, 9

*U.S. v. Garrity*,
    304 F. Supp. 3d 267 (D. Conn. 2018)..............................................................................7, 17

*U.S. v. Garrity*,
    No. 3:15-cv-243-MPS, 2019 WL 1004584 (D. Conn. Feb. 28, 2019) ...................................14

*U.S. v. Horowitz, et al.*,
    No. PWG-16-1997, 2019 WL 265107 (D. Md. Jan. 18, 2019) .............................................14

*U.S. v. Kaiser*,
    363 U.S. 299 (1960)..............................................................................................................16

*U.S. v. Katholos*,
    No. 17-cv-00531, 2018 U.S. Dist. LEXIS 146743 (W.D.N.Y. Aug. 28, 2018) .....................17

*U.S. v. McBride*,
    908 F. Supp. 2d 1186 (D. Utah 2012)................................................................9, 10

*U.S. v. Moore*,
    No. C13-2063RAJ, 2015 U.S. Dist. LEXIS 99804 (W.D. Wash. July 24, 2015) ..................13

*U.S. v. Schoenfeld*,
    344 F.Supp.3d 1354 (M.D. Fla. 2018)................................................................14

*U.S. v. Villanueva*,
    716 Fed. Appx. 928 (11th Cir. 2018)................................................................16

*U.S. v. Wahdan*,
    325 F.Supp.3d 1136 (D. Colo. 2018)..............................................................14, 15

*U.S. v. Williams*,
    Civil Action No. 1:09-CV-00437, 2014 U.S. Dist. Lexis 105666 (E.D. Va.
    June 26, 2014)..................................................................................10, 12

*U.S. v. Wynn*,
    61 F.3d 921 (D.C. Cir. 1995)........................................................................8

## Statutes

26 U.S.C. § 6501(c)(4) (2018)..........................................................................20

26 U.S.C. § 6672 (2018)..................................................................................8

31 U.S.C. § 5314 (1982)..............................................................................15, 20

31 U.S.C. § 5311, *et seq.* (2001)....................................................................6, 20

31 U.S.C. § 5321 (2004)...........................................................................*passim*

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1946)..........................................10, 13

American Jobs Creation Act of 2004, Pub. L. 108-357, 31 U.S.C. § 5321(a)(5)(C)
    (2004)...........................................................................................13, 17

Currency and Foreign Transactions Reporting Act, Pub. L. 91-508, 84 Stat. 1118
    (1970)............................................................................................6, 20

## Other Authorities

31 C.F.R. § 103.24 (1987)............................................................................6, 20

31 C.F.R. § 103.32 (1987)..............................................................................20

31 C.F.R. § 103.57 (1999)..............................................................................20

31 C.F.R. §§ 1010.350 (2011) ...................................................................................................6

31 CFR § 1010.810(g) (2014) ...................................................................................................15

31 CFR § 1010.820 (2016) .........................................................................................6, 13, 14, 15

31 CFR § 1010.821 (2018) .................................................................................................14, 15

75 Fed. Reg. 65806 (Mar. 1, 2011) ....................................................................................6, 14

81 Fed. Reg. 42503 (June 30, 2016) ........................................................................................14

Fed. R. Civ. P. 56(c) ...................................................................................................................7

Treasury Order 180-01, 67 Fed. Reg. 64697 (Sept. 26, 2002) ...........................................7, 15, 20

U.S. Const. amend. VIII...........................................................................................................16

Defendant Isac Schwarzbaum (Isac) pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment in his favor.

## PRELIMINARY STATEMENT

During the years at issue, 2006-2009, Isac maintained bank accounts in Switzerland that should have been disclosed on an FBAR. Isac got bad advice his from U.S. Certified Public Accountants (CPAs), whom he had no reason to doubt and whose advice he was not required to challenge.

The facts of this case can be distinguished from all other FBAR cases adjudicated: unlike all other cases (i) Isac attempted to satisfy his obligations by filing FBARs; (ii) Isac was not moving money abroad from the U.S. to conceal U.S. income; (iii) Isac maintained Swiss bank accounts because they were funded with monies already in Switzerland and gifted by his Swiss-based father, and because of his deep connections to Switzerland.

Based on undisputed facts, it is clear that Isac did not willfully violate his FBAR filing requirements. Furthermore, based on undisputed facts, the Internal Revenue Service's (IRS) FBAR determination should be set aside because it is arbitrary and capricious, violates the Eighth Amendment, and was assessed after the expiration of the limitations period.

## BACKGROUND

**I.    Factual Background**

   **A.    The Early Life of Isac Schwarzbaum**

Isac was born in Germany to parents who had resettled from Poland. (SOF ¶ 1.) Although very successful financially later in life, Isac's father's early life was difficult as he was uneducated, poor and narrowly escaped death in a Nazi concentration camp. (SOF ¶ 2.) His parents gained German citizenship after his father was unable to return to Poland, and in the 1980s moved to Switzerland where they lived until their deaths. (SOF ¶ 3.)  At no time did his parents have any U.S. legal status, i.e., were never citizens or residents.  (SOF ¶ 4.)

Like his parents, Isac was not well-educated. He received a high school diploma in Germany in the 1970s, but was unable to attend university because he performed poorly in high school. (SOF ¶ 5.) While in the German education system, Isac never studied U.S. law, tax law, or accounting and received only basic education in the English language. (SOF ¶ 6.)

### B.     The Adult Years of Isac Schwarzbaum

Isac has never been successful in business, having started, but failed at several businesses, including a fitness center in Spain, a real estate business in Costa Rica, and as a realtor in Florida. (SOF ¶ 7.) Isac's occupation as "investor" or "businessman" as listed on his tax returns are placeholders used by his CPAs. (SOF ¶ 8.) Blessed as a single father of two young children born through surrogacy, Isac has always supported himself and his children with his inheritance. (SOF ¶ 9.) While protective of that inheritance for the sake of his children, Isac has been a generous supporter of charities over the years and since 2007 has maintained a U.S. trust with bequeaths to several charities. (SOF ¶ 10.)

#### 1.     Isac's connection with the U.S.

Although retaining German citizenship since birth, Isac became a U.S. citizen in 2000. (SOF ¶ 11.) Isac spent most of his time outside the U.S., splitting his time for the years at issue among the U.S., Costa Rica, and Switzerland. Based on Isac's recollection, he was present in the U.S. approximately: 2006 – 62 days; 2007 – 30 days; 2008 – 122 days; 2009 – 182 days. (SOF ¶ 12.) The remainder of these years was split between Costa Rica (his primary residence) and Switzerland (where his family maintained a room solely for Isac). (SOF ¶ 12.)  Isac moved to Switzerland full-time in 2010, with intentions to remain, but returned to the U.S. in 2016, where he lives modestly with his children in Jupiter, Florida. (SOF ¶ 13.)

While Isac's English has improved through his time spent in the U.S., English is Isac's fourth or fifth language and he still struggles with English reading comprehension (which was to blame when Isac sat for, but failed, the Florida real estate license exam twice).  (SOF ¶¶ 6,14.)

#### 2.     Advice Isac received from his Swiss father

As Isac's father's health declined in Switzerland, he began gifting Isac significant sums of money and directly assigning bank accounts over to Isac. (SOF ¶ 15.) His father's instructions were clear: the gifted funds should be held conservatively, as a legacy for future generations and as a way to help others. (SOF ¶ 16.) Given his traumatic life experiences, Isac's father was also insistent that Isac follow his practice to diversify the funds over many Swiss banks. (SOF ¶ 17.) Isac's father passed away in July 2009. (SOF ¶ 18.)

#### 3.     Preparation of tax returns and FBARs

Isac relied on licensed accountants in all three countries in which he spent time. (SOF ¶ 19.) As the IRS agent assigned to Isac's examination, IRS Revenue Agent James Bjork agreed in

his deposition testimony, "in all three countries where he paid taxes, Costa Rica, Switzerland, and the U.S., Isac Schwarzbaum paid a high-level, experienced tax preparer [sic] to make sure he was tax compliant." (SOF ¶ 19.)

It was only later in time that Isac learned that he got bad advice from his U.S. CPAs. Specifically, Isac received advice that there was no U.S. income tax due on the foreign gifts he received, and only foreign accounts with a connection to the U.S. needed to be accounted for with the IRS and reported on FBARs. (SOF ¶ 20.) This advice, now known to be incorrect, has forever changed the course of Isac's life and that of his children.

Prior to the years at issue, Isac relied on CPA Brian Gordon. (SOF ¶ 21.) Isac told Gordon – and all three of his CPAs – that he had received monetary gifts and supported himself by such gifts from his foreign-based father. (SOF ¶ 22.) Isac also told Gordon about the existence of the accounts he maintained in Switzerland. (SOF ¶ 23.) While Gordon prepared Isac's income tax returns for several years up to 2005, Gordon never included the interest earned from foreign accounts and never prepared FBARs. (SOF ¶ 24.) Gordon advised Isac that he did not need to report his foreign accounts because such accounts were located outside the United Sates. (SOF ¶ 25.)

For tax year 2006, Isac hired CPA Doris Shaw. (SOF ¶ 26.) Like Gordon, Isac told Shaw about the gifts from his foreign-based father. (SOF ¶ 27.) Shaw advised Isac to report accounts with which there was a U.S. connection. (SOF ¶ 28.) Shaw prepared Isac's 2006 income tax return and she prepared an FBAR consistent with that advice, reporting a foreign account in Costa Rica because it was funded with monies that came from the U.S. (SOF ¶ 29.)[1] Because Isac's Swiss accounts had no connection to the U.S. – i.e., money was not transferred to or from the U.S. to those accounts – they were not accounted for in either 2006 the income tax return or the FBAR.

When Isac moved to a different area in Florida, he hired CPA Steven Weitz. (SOF ¶ 32.) Again, like the CPAs before him, Isac told Weitz he had received monetary gifts and supported himself by such gifts from his foreign-based father. (SOF ¶ 33.) For the years 2007-2009, Weitz

---

[1] The 2006 Schedule B reflects "Scotiabank" and reports interest income of $8,499. (SOF ¶ 30.) At the time, Isac had an interest in two separate bank accounts in Scotiabank Costa Rica. (SOF ¶ 31.) Presumably, based on the FBAR Shaw prepared, she only reported the account with a U.S. connection.

participated in the preparation of Isac's income tax returns.[2] (SOF ¶ 34.) Notwithstanding the inclusion of interest earned from foreign accounts in 2008 and 2009, Schedule B of the income tax returns for all years shows that box 7a — asking whether a taxpayer has foreign account — was marked "no." (SOF ¶¶ 36, 37.) Weitz testified that this was because computer software used at the time defaulted to "no" and did not prompt tax preparers to ask clients whether they had foreign accounts. (SOF ¶ 38.)

Because Weitz told Isac he was not familiar with the FBAR reporting requirement, Isac replicated the 2006 FBAR prepared by Shaw and filed it for 2007 and 2009[3] again reporting only foreign accounts that had a U.S. connection. (SOF ¶ 40.) In a good faith effort to comply with his reporting requirements, for the 2007 FBAR, Isac went beyond what was required and attached an online statement from his U.S. Citibank account that reflected a $5 million deposit that Isac received from his father, because it had a U.S. connection. (SOF ¶ 43.) For his 2009 FBAR, Isac reported a Swiss account with the balance of approximately $4.4 million, and going beyond what was required, noted "(transfer from Bank of America new account since 2009)." (SOF ¶ 44.)

In summary, with respect to all years at issue, Isac hired qualified CPAs, provided the information they requested, told them about the gifts from his foreign-based father, and believed he was getting sound advice. Their advice never struck Isac as incorrect as Isac had no familiarity or training in U.S. tax matters. Isac believed he was fully compliant with all applicable tax and reporting laws. Reporting foreign accounts with a U.S. connection, as advised by CPA Shaw, made sense to Isac based on the fact that unlike the U.S., Switzerland, Costa Rica, and other countries are source-based taxation systems, i.e., taxes are due only on money earned in that country.  (SOF ¶ 45.)

---

[2] The 2007 1040 tax return itself, and other documents recently obtained, indicate that another individual with Weitz's firm prepared the 2007 return. Isac has no specific recollection of this individual. (SOF ¶ 35.)

[3] Isac did not file than original 2008 FBAR. Near the filing date, he had a heart attack which left him incapacitated and while he was recuperating, his father passed away.  (SOF ¶ 41.) Bjork agreed that the lack of filing of the 2008 was "reasonable … because of his medical situation." (SOF ¶ 42.)

### C.   IRS Matters

#### 1.   IRS OVDI and Income Tax

In October 2009, Isac received a lengthy and technical letter from one of his banks in Switzerland – UBS. (SOF ¶ 46.) The letter indicated, among other things that the IRS had submitted a request under treaty to the Swiss government to obtain information on accounts from UBS. (Id.) Isac was confused by and did not understand the letter, so he sought the advice of a Swiss attorney, who advised Isac that under Swiss law the letter did not apply to him. (SOF ¶ 47.) Isac relied on this legal advice and agreed with his Swiss lawyer's recommendation to seek relief. (SOF ¶ 47.)

It was not until February 2011 that Isac for the first time understood that he got bad advice from his U.S. CPAs. (SOF ¶ 48.) Shortly thereafter, Isac entered into the IRS's voluntary disclosure program known as Offshore Voluntary Disclosure Initiative (OVDI). (SOF ¶ 49.) Isac and the IRS agreed to the additional income tax, interest, and accuracy-related penalties due as a result of the failure to report interest earned from the foreign accounts. (SOF ¶ 50.) Isac promptly paid such amounts. (SOF ¶ 51.)

As was commonplace for taxpayers who were noncompliant due to non-willful conduct, Isac then opted out of OVDI and underwent full examinations under Title 26 (the Internal Revenue Code of 1986, as amended) and Title 31 (FBAR).[4] (SOF ¶¶ 52,53.)

#### 2.   IRS Examinations

IRS Revenue Agent Bjork was assigned to Isac's case one day before his one and only interview with Isac, which lasted between 1 and 1.5 hours.  (SOF ¶ 54.) Bjork testified that Isac was "very cooperative" and truthful throughout the examinations, but Bjork knew very few details about Isac's case prior to the interview, due to his lack of the usual amount of preparation.  (SOF ¶ 55.)

Near the conclusion of the FBAR examination, Bjork determined that the IRS should assert a non-willful FBAR penalty of $221,394; his supervisor, IRS Supervisory Agent Erik Anderson agreed. (SOF ¶ 56.)  That finding was communicated to Isac through his counsel. (SOF ¶ 57.) However, Clinton West, an IRS Offshore Technical Adviser who had no actual involvement in the

---

[4] The Streamlined Filing Compliance Procedures, the IRS program by which non-willful taxpayers remediate their tax noncompliance, was not implemented until 2012, and in its current iteration, 2014.

examination, never spoke to Isac or his representatives, and never developed any new facts, overruled the non-willful recommendation. (SOF ¶¶ 58, 59.)

By contrast, the Title 26 examination was concluded with only the assessment of accuracy-related penalties (i.e., no willful civil fraud or related penalties) for the underpayment of income tax and no penalties for failure to file information returns (e.g., Forms 3520 and 5471) that typically are avoidable only after a showing of reasonable cause. (SOF ¶ 60.)

The willful FBAR penalties were ultimately assessed on September 6, 2016. (SOF ¶ 61.) Pursuant to the complaint, the aggregate amount of the penalties, plus late payment penalties and interest, is $15,599,072. (SOF ¶ 62.) Thus, *one person*, who never spoke with Isac or any of his representatives, and had no involvement in the examinations, changed the FBAR penalty from $221,394 to over $15 million.

## II.   Legal Background

### A.   The Bank Secrecy Act

The FBAR dates back to Congress's 1970 enactment of the Currency and Foreign Transactions Reporting Act (commonly known as the Bank Secrecy Act, or BSA), *See* Currency and Foreign Transactions Reporting Act, Pub. L. 91-508, 84 Stat. 1118 (1970).[5] The BSA and its implementing regulations require U.S. persons having a financial interest in foreign accounts exceeding $10,000 to file a Form TD-F 90.22-1, Report of Foreign Bank and Financial Accounts, *simply referred to as FBAR. See* 31 C.F.R. §§ 1010.350; 1010.306(c).[6]

Failure to file the required FBAR results in the possible imposition of penalties. Congress gave discretionary authority, providing penalties "may" be imposed and providing for willful and non-willful penalties. 31 U.S.C. § 5321(a)(5)(A). Congress also stated that no penalty should be imposed if any violation was due to reasonable cause. *Id.* at 5321(a)(5)(B)(ii). For willful violations, the maximum statutorily authorized penalty is the greater of $100,000 or 50 percent of the relevant account balance (*id.* at § 5321(a)(5)(C)) which the applicable regulations cap at $100,000 (31 CFR. § 1010.820(g)).

---

[5] Currently codified at 31 U.S.C. § 5311 *et seq.*
[6] The FBAR regulations were renumbered effective 2011 (e.g., 31 C.F.R. § 1010.350 was formerly 31 C.F.R. § 103.24). *See* 75 Fed. Reg. 65806 (Oct. 26, 2010).

## B. Lack of Awareness of FBAR

The Financial Crimes Enforcement Network (FinCEN) was delegated authority over BSA. *See* Treasury Order 180-01, 67 Fed. Reg. 64697 (Sept. 26, 2002). FinCEN subsequently redelegated portions of its enforcement authority to the IRS. *See* Memorandum of Agreement and Delegation of Authority for Enforcement of FBAR Requirements (Apr. 2, 2003). FinCEN and the IRS did a poor job educating the public and tax professionals in the FBAR filing obligation. For example, in its 2009 Annual Report to Congress, the National Taxpayer Advocate (conveying comments from the New York State Bar Association) identified one of the most serious problems as the uncertainty around FBARs:

> [T]he FBAR guidance process is very confusing and informal, with often conflicting information scattered through the IRS website, requiring taxpayers and practitioners to engage in a "scavenger hunt to find relevant information with no guarantee that the information will not be 'reviewed or updated' the next day on the website."

National Taxpayer Advocate, 2009 Annual Report to Congress, Volume 1, page 144.[7]  Even IRS officials, including Bjork, a 30-year IRS veteran, were not immune from being uninformed about FBARs.  In fact, Bjork first learned about FBARs in 2012 (SOF ¶ 63) over *six years after* the reporting periods for which Isac is being penalized for his failure to understand FBARs.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show no genuine issue exists as to any material fact and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). Isac is entitled to summary judgment because no such genuine issue exists.

## ARGUMENT

## I. Isac Was Not Willful

The Court reviews whether Isac willfully violated his FBAR requirements *de novo. See U.S. v. Garrity*, 304 F. Supp. 3d 267, 270 (D. Conn. 2018).

---

[7] Available at https://www.irs.gov/pub/tas/1_09_tas_arc_vol_1_preface_toc_msp.pdf (last visited 7/10/2019).

### A.   Willful Standard

Section 5321 authorizes a penalty for willful violations of the FBAR reporting requirements, but does not define the term "willful." *See* 31 U.S.C. § 5321. Because section 5321 involves civil penalties, the relevant definition of willfulness is the definition applied in other civil contexts, including tax collection and compliance with reporting requirements. *Bedrosian v. U.S.*, 912 F.3d 144, 152-53 (3d Cir. 2018).

To show willfulness based on an actual-knowledge theory, the government must prove that Isac knew about the FBAR requirements and that Isac knew the requirements applied to *him*. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-57 (2007); *U.S. v. Wynn* , 61 F.3d 921, 928 (D.C. Cir. 1995); *U.S. v. Flume*, No. 5:16-cv-73, 2018 WL 4378161, at fn 9 (S.D. Tex. Aug. 22, 2018).

In the comparable context of the penalty under 26 U.S.C. § 6672, this Circuit also defines willfulness to include recklessness. *Scott v. U.S.*, No. 17-13741, 2019 WL 2451049 (11th Cir. June 12, 2019); *Malloy v. U.S.*, 17 F3d 329, 332 (11th Cir. 1994); *Mazo v. U.S.*, 591 F.2d 1151, 1155 (5th Cir. 1979).[8]   The reckless requirement is satisfied under Section 6672 if the taxpayer acts with a reckless disregard of a known or obvious risk that trust funds (withholding taxes) may not be remitted to the government, such as by failing to investigate or to correct mismanagement *after being notified* that withholding taxes have not been duly remitted. *Mazo*, 591 F.2d at 1155 (emphasis added). See also, *Bedrosian,* in which the Third Circuit was uncertain as to whether the lower court considered whether the taxpayer "clearly ought to have known there was a grave risk that [an accurate FBAR was not being filed]." *Bedrosian*, 912 F.3d at 153.

"Reasonable cause," i.e., reliance on accountants/attorneys, can avoid a finding of willfulness. *See Thosteson v. U.S.*, 331 F.3d 1294, 1301(11th Cir. 2003). The Supreme Court recognized that taxpayers are not tax experts and are entitled to rely on the advice of tax professionals. Specifically, the Court stated:

> "When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. ***
> To require the taxpayer to challenge the attorney, or seek a "second opinion," ***
> would nullify the very purpose of seeking the advice of a presumed expert in the first place. *** "Ordinary business care and prudence" does not demand such actions." *U.S. v. Boyle*, 469 U.S. 241, 251 (1985).

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### B.     Isac Was Not Willful Under This Standard

####      *1.     Isac was not willful because he did not have actual knowledge*

Isac did not have actual knowledge of the full extent of his FBAR reporting requirements. Isac's conduct is not comparable to other taxpayers determined to be willful for FBAR violations. In every case, the willful taxpayer was not a foreigner, like Isac, but a U.S. citizen born and raised in the U.S., who had no pre-existing relationship to foreign banks until the decision was made by the U.S. citizen for tax avoidance reasons to open a foreign account. A classic example is the case of Edward Flume, a U.S. citizen residing in Mexico,  who was found to have willfully violated his FBAR reporting requirement, in part, because he was a savvy businessman, disregarded his tax preparers' letters reminding him of his obligation to disclose his foreign accounts, and used an offshore Belize company within his control to conceal monies from the IRS. *See U.S. v. Flume*, No. 5:16-cv-73, 2018 WL 4378161 (S.D. Tex. 2019).

Isac, in contrast to Flume, is an unsophisticated taxpayer who hired only CPAs, and never sought to disguise funds from tax authorities in any jurisdiction. Isac's business failures demonstrate that he is unsophisticated and clearly is not a savvy businessman. Moreover, Isac did not simply hire any U.S. tax preparer; he hired only CPAs to advise him on his U.S. tax filings. Unlike Flume, Isac did not establish an elaborate offshore corporate structure to funnel payments to himself by routing funds through intermediaries in an attempt to disguise the source of the payments from tax authorities. Consequently, a review of the factors found in prior FBAR cases used to establish "knowledge" demonstrates that Isac did not have actual knowledge of the FBAR reporting requirements.

####      *2.     Isac's reliance on qualified certified public accountants disproves recklessness*

There are no facts to establish that Isac either avoided or purposefully avoided to learn facts that would confirm an FBAR obligation. To the contrary, Isac went to three different CPAs, and informed them of the fact that his father who lived in Switzerland was making gifts to him. (SOF ¶¶  22, 27, and 33.)  Isac reasonably relied on those professionals; thus, his conduct did not represent an unjustifiably high risk of harm that was known, or so obvious that it should have been known—i.e., Isac was not reckless nor willfully blind.

*U.S. v. McBride* provides an example of the egregious conduct that is considered willful blindness. *See U.S. v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012). McBride hired a firm to

propose tax avoidance options and upon learning of their proposal, responded, "This is tax evasion." *Id*. at 1190. McBride nevertheless requested that the firm establish the proposed structure. McBride received literature from the firm in which it advised McBride that he was required to report his financial interest in, or signature or other authority over, any foreign bank, securities, or other financial account, and that intentional failure to comply with this reporting requirement is a crime. *Id*. at 1191.

The court found that McBride's failure to file FBARs to report his interest in the foreign accounts was willful — not difficult in light of the fact that McBride read promotional materials from the firm advising him of his FBAR filing obligation.

The court based its willfulness determination on the fact that McBride recklessly ignored the known or obvious risk that his conduct was illegal by taking deliberate actions to avoid learning of that fact. Contrary to McBride, Isac did not ignore any known or obvious risk that his FBAR filings were not fully reporting all accounts that should have been included on the form, and he did not take any deliberate actions to avoid learning of that fact. His conduct was not willful or willfully blind. Unlike McBride, when Isac became aware of his duty to report all foreign accounts, regardless of a U.S. connection.

## II.   The IRS Determination Should be Set Aside Under the APA

In addition to determining whether Isac willfully violated his FBAR duties *de novo*, the Court must also consider whether the IRS was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1946). Such review requires the Court to review the IRS's administrative record for an abuse of discretion. *Moore v. U.S.*, No. C13-2063RAJ, 2015 U.S. Dist. LEXIS 43979, at *22, *29 (W.D. Wash. Apr. 1, 2015), *citing Nat'l Ass'n of Home Builder*, 340 F.3d 835, 841 (9th Cir 2003). Isac submits that both the IRS's determination of willfulness **and** (assuming arguendo there was a willful violation) the amounts of penalties violated the APA.

### A.   The IRS violated the APA in determining Isac was willful

To be valid under the APA, the IRS must have made a *reasoned decision* after considering the *relevant factors*. *E.g., U.S. v. Williams*, Civil Action No. 1:09-CV-00437, 2014 U.S. Dist. Lexis 105666, *5 -*6  (E.D. Va. June 26, 2014). In Isac's case, the IRS considered misleading, undeveloped, or simply untrue factors to determine Isac willfully violated his FBAR obligations. To add insult to injury, the IRS - through an agent who had no interactions with Isac or his representatives and reviewed the file only for a limited time – used those same factors to then

conclude Isac was willful. Per the administrative record, the IRS considered the following factors in making its determination:

**_Misleading Claim 1_**: Isac was seeking some "benefit" by failing to report his foreign accounts. (SOF ¶ 64.) **_Actual Fact 1_**: It is clear that some perceived financial "benefit" was not Isac's motivation. For example, for 2006 the total "benefit" to Isac in terms of income tax on the unreported accounts was only $20,475 (i.e., he saved $20,475 in tax). (SOF ¶ 66.) By contrast, the willful FBAR penalty asserted for 2006 is $1,173,778. Isac's motivation was to be compliant. (SOF ¶ 67.)

**_Misleading Claim 2_**: Isac undertook "affirmative acts of maintaining significant involvement in the management of the foreign accounts." (SOF ¶ 64.) **_Actual Fact 2_**: Almost all investments in Isac's foreign accounts were conservative fixed income investments, many of which were gifted directly to Isac, while others were selected by the banker advisors. (SOF ¶ 68.) Bjork testified that he was unaware of any such affirmative acts. (SOF ¶ 68.)

**_Misleading Claim 3_**: Isac failed to report interest earned on the foreign accounts. (SOF ¶ 64.) **_Actual Fact 3_**: Isac's original 2006, 2008, and 2009 tax returns reported interest income from certain foreign accounts. (SOF ¶ 69.)

**_Misleading Claim 4_**: Isac failed to inform his tax return preparers about the existence of Swiss accounts. (SOF ¶ 64.) **_Actual Fact 4_**: Isac informed Gordon of his Swiss accounts. (SOF ¶¶ 21-25.) Shaw advised Isac that only foreign accounts with a U.S. connection need to be accounted for. In 2009, the only year in which any of Isac's Swiss accounts had a U.S. connection, he reported the $4.4 million dollar Swiss account on his FBAR. (SOF ¶ 70.)

**_Misleading Claim 5_**: The Schedule Bs on Isac's income tax returns were incomplete, inaccurate, or both. (SOF ¶ 64.) **_Actual Fact 5_**: On Isac's 2006 income tax return Shaw answered "yes" to the Schedule B foreign account question; however, because of her erroneous understanding she only reported one foreign jurisdiction – Costa Rica, because Isac transferred money from a U.S. account to that account. (SOF ¶ 71.) As discussed above, tax preparation software was used to prepare Isac's tax returns for 2007-2009 and the software did not prompt an inquiry about foreign accounts but rather defaulted to answering the Schedule B foreign account question "no." (SOF ¶ 72.)

**_Misleading Claim 6_**: "the opening and closing of various Swiss accounts also showed regular and continuous involvement." (SOF ¶ 64.) **_Actual Fact 6_**: In fact most of the "opening and

11

closing" of the foreign accounts was in 2008 and 2009, when the banks, particularly Swiss banks, were failing, and Isac's father advised him to diversify his bank accounts. (SOF ¶ 73.)

***Misleading Claim 7***: Isac requested that certain banks retain his mail in an attempt to conceal these accounts. (SOF ¶ 64.) ***Actual Fact 7***: During the years at issue, Isac spent considerable time outside of Switzerland and in most years a majority of his time in Costa Rica (his primary residence), which had an unreliable mail delivery system and a chronic mail theft problem. (SOF ¶ 74.) He used his U.S. address and/or his U.S. passport when opening some of the foreign accounts at issue, e.g., UBS 9250 and Clariden Leu, but did not want bank statements and correspondence sent to the U.S. to then be forwarded to Costa Rica. (SOF ¶ 75.)

***Misleading Claim 8***: "the establishment of an offshore corporate entity … further leads one to conclude that the taxpayer acted willfully." (SOF ¶ 64.) ***Actual Fact 8***: During the years at issue, Isac's primary residence was Costa Rica. Isac formed a Costa Rican entity to conduct an active real estate investment business ***in Costa Rica***. (SOF ¶¶ 76,77.) As Bjork testified, this was a normal and appropriate business practice. (SOF ¶ 78.)

Above are just some of the misleading claims propounded by the IRS. Telling is Bjork's testimony at his deposition. After showing him that several factors on which the IRS relied were not accurate he was asked: "Question: And is that kind of true of this case, if we all knew now— then what we know now, it would have been different…? Answer: Yes." (SOF ¶ 65.)

In the four months between Bjork's non-willful Title 31 exam conclusion, and the overruling of his determination, there was no further investigation even though Isac was clearly willing to cooperate. Indeed, the original non-willful and final willful lead sheets are ***nearly identical*** with respect to facts relied upon, with a discernible difference being the first sentence: "[t]he Government concludes that ***non-willful*** FBAR penalties apply" was revised to read "[t]he Government concludes that ***willful*** FBAR penalties apply." (SOF ¶ 79.)

The IRS's decision is therefore not adequately explained and supported by the record and therefore such acts fail to demonstrate that the agency engaged in reasoned decision making. *Williams* at *5-6; *see also Clark County v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008).

### B.    The IRS Violated the APA in Determining the Amounts of Penalties

Once the IRS determines a taxpayer willfully violated the FBAR reporting requirements, Congress gave wide discretion to the IRS, which ultimately rests on the examiner (Revenue Agent Bjork) on whether to assess a penalty and the amount of such penalty. 31 U.S.C. § 5321(a)(5)(A);

IRM 4.26.16.4.6 (07-01-2008) (The statutory penalty computation provides a ceiling on the FBAR penalty. The actual amount of the penalty is left to the discretion of the examiner.) Given this wide discretion to examiners, the IRS provided guidance to its employees to ensure that similarly situated taxpayers are penalized similarly.

This guidance is not in the form of regulations promulgated and codified under the Administrative Procedure Act with the corresponding ability for the public notice and comment. Rather, this guidance can largely be found in internal memoranda which are then reflected in the Internal Revenue Manual. The Internal Revenue Manual does not have the force of law. *E.g.*, *Fargo v. Comm'r.*, 447 F.3d 706, 713 (9th Cir. 2006).

In Isac's case, the IRS did not asses the statutory maximum for a willful FBAR penalty. Rather, through discovery, the IRS explained its methodology for determining the penalty, which is not based on law, regulation, or published guidance (including the Internal Revenue Manual) but rather on "informal discretionary mitigation guidelines" and some additional discretion by Bjork.  (SOF ¶ 82.) In *Moore v. U.S.*, the court upheld the penalty amount by ruling that the penalties contained in the Internal Revenue Manual are not an abuse of discretion. *U.S. v. Moore*, No. C13-2063RAJ, 2015 U.S. Dist. LEXIS 99804, at *3 (W.D. Wash. July 24, 2015). In Isac's case, the IRS does not contend it relied on its own manual.

It is hard to imagine a more arbitrary decision than when deciding how to penalize a taxpayer. The IRS selected a penalty amount based on a gut feeling of what was appropriate rather than the application of written penalty guidance (including previously promulgated regulation that capped the penalty at $100,000 per bank account) that existed at the time.

### C.    The FBAR Penalties Violated the APA Because They Violated FinCEN Regulations

For willful FBAR violations, the maximum statutorily authorized penalty is the greater of $100,000 or 50 percent of the relevant account balance. 31 U.S.C. § 5321(a)(5)(C). However, the implementing regulation caps the penalty at $100,000. 31 CFR § 1010.820(g). The IRS has consistently taken the position 31 CFR § 1010.820(g) is *void ab initio* since 2004, when Congress increased the willful penalty (American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004)) and assessed amounts greater than the $100,000.

Six different courts have ruled on this issue, but none of these courts had the benefit of the Supreme Court's decision in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019). In *Kisor*, the Supreme Court

tackled the central issue – how much deference should an agency's interpretation of its own rules be given. In *Kisor*, the Supreme Court set forth a five factor test as to deference:

- First, a court should not afford *Auer*[9] deference unless the rule is genuinely ambiguous applying statutory rules of construction to the regulation.

- Second an agency's interpretation of its own rule must reflect "fair and considered judgment" to receive *Auer* deference. That means, that a court should decline to defer to an interpretation adopted that is merely a "convenient litigating position" or "*post hoc* rationalizatio[n] advanced" to "defend past agency action against attack."

- Third, the agency's interpretation must be one actually made by the agency. In other words, it must be the agency's "authoritative" or "official position," rather than any more ad hoc statement not reflecting the agency's views.

- Fourth, an agency's interpretation must reflect "fair and considered judgment" to receive *Auer* deference. A court may not defer to a new interpretation, whether or not introduced in litigation, that creates "unfair surprise" to regulated parties.

- Fifth, the agency's interpretation must in some way implicate its substantive expertise.

Here, there is clearly an ambiguity — two courts[10] have held for the taxpayers and four courts[11] have held for the IRS. Much of the uncertainty is because 31 CFR § 1010.820(g) and its predecessor have been around since 1987. Congress amended Section 5321(a)(5)(C) in 2004, yet in 2010 the BSA regulations were amended and no substantive changes were made to the language at issue. *See* 75 Fed. Reg. 65086, at 65807. Moreover, 31 CFR § 1010.821 provides that the willful FBAR penalty imposed under Section 5321(a) shall be adjusted for inflation. In 2016, 31 CFR § 1010.820 was amended to account for inflation and yet again did not account for the 2004 statutory change. 81 Fed. Reg. 42503.

---

[9] Under that Auer deference, Court deferred to an agency's reasonable reading of its own genuinely ambiguous regulations. *Auer v. Robbins,* 519 U.S. 452 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945).

[10] See *U.S. v. Colliot*, No. AU-16-CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018); *U.S. v. Wahdan*, 325 F.Supp.3d 1136, 1139 (D. Colo. 2018).

[11] *See U.S. v. Schoenfeld*, 344 F.Supp.3d 1354 (M.D. Fla. 2018); *U.S. v. Garrity*, No. 3:15-cv-243-MPS, 2019 WL 1004584 (D. Conn. Feb. 28, 2019); *U.S. v. Horowitz, et al.*, No. PWG-16-1997, 2019 WL 265107 (D. Md. Jan. 18, 2019); *Kimble v. U.S.*, 141 Fed. Cl. 373 (2018); *Norman v. U.S.*, 138 Fed. Cl. 189, 195 (2018).

In 2002, Treasury expressly delegated to FinCEN the authority to "implement and administer" the BSA, through the "promulgation and amendment of regulations and the assessment of penalties." Treasury Order 180-01, (Sept. 26, 2002), 67 Fed. Reg. 64697 (Oct. 21, 2002). FinCEN then delegated the authority to the IRS to "assess and collect civil penalties under 31 U.S.C. 5321 and 31 CFR 1010.820[.]" 31 CFR § 1010.810(g). Importantly, FinCEN did not delegate its responsibilities as to issuing regulations to the IRS.

Because FinCEN issued the regulation at issue, and continues to hold such authority, the IRS interpretation of FinCEN's regulation does not warrant deference. In fact, under the guise of interpreting the regulation, the IRS is creating *de facto* a new regulation by voiding §1010.820(g) and in effect rewriting §1010.821, i.e., creating a range of $124,588 to 50% of the relevant account balance. The position espoused by the IRS does not reflect considered judgement but rather it represents solely a "convenient litigating position" and an "unfair surprise." If the regulation is to be struck, then the power to strike the regulation should be reserved for the authorized administrative agency, FinCEN, and not with the IRS.  Until FinCEN undertakes that task, then the *Colliot* and *Wahdan* decisions should be followed as properly interpreting the statute and regulation at issue: Section 5321(a)(5) sets a ceiling for penalties assessable for willful FBAR violations, but it does not set a floor. Thus, assuming *arguendo*, Isac willfully violated his FBAR reporting requirements during the years at issue, the civil penalty is limited to the greater of the amount in the account at the time of the violation but capped at $100,000.

### D. The FBAR Penalties Violated the APA because they Violated the Duty of Consistency

Following Isac's opt-out from OVDI, the IRS conducted both Title 26 and Title 31 examinations. (SOF ¶ 52.) These examinations were based on (i) the exact same set of facts, (ii) a review of willfulness based on application of substantially identical underlying law[12], and (iii) as a matter of law, the two Titles constituting "related statues." *See Hom v. U.S.*, No. C 13-02243 WHA, 2013 WL 5442960 (N.D. Cal. Sept. 30, 2013) (holding that 31 U.S.C. 5314 is a related statute to Title 26).

While IRS Supervisory Agent Erik Anderson denied that the IRS made a "determination" under Title 26 with respect to the closing of the Title 26 examination, the IRS Title 26 findings

---

[12] *Bedrosian v. U.S.*, 912 F.3d 144 (3d Cir. 2018) (stating that willfulness for Title 31 purposes is that which is used in other civil tax law contexts).

indicate that Isac was assessed only negligence-based accuracy penalties and was not assessed any willful-based civil fraud penalties. (SOF ¶ 60.) In addition, the underlying documents relevant to the closing of the Title 26 case demonstrate that the IRS documented its administrative file to conclude that Isac did not engage in any willful conduct, that Isac owed no additional taxes, penalties or interest thereon, and that a "no change" finding was merited. (SOF ¶ 84.) Furthermore, it is clear that the IRS Title 31 *initial* findings concluded that Isac was only subject to a non-willful FBAR penalty (and this conclusion was later reversed at the behest of Clinton West).  (SOF ¶¶ 53,56, and 59.)

The IRS acted arbitrarily and capriciously in reaching opposite conclusions of "willfulness" on an identical set of facts and legal precedent holding Title 31 willfulness is determined similarly to other civil tax law contexts, particularly in light of the judicial determination that Title 26 and Title 31 are "related statues." *See Hom, 2013 WL 5442960, at 2.* As a matter of law, the IRS in reaching a non-willfulness finding under Title 26 based on the exact same set of facts and substantially identical underlying law, may not then in the related Title 31 examination reach the opposite conclusion. The IRS's Title 31 willful determination violates its "duty of consistency." Specifically, the Supreme Court noted that the IRS must have a rational basis for differing tax treatment and that "it can be an independent ground of decision that the Commissioner has been inconsistent…." *U.S. v. Kaiser*, 363 U.S. 299, 308 (1960) (Frankfurter, J. concurring).

To allow the IRS to conduct two parallel examinations for Title 26 and Title 31 purposes based on the same exact set of facts and substantially identical underlying law, and to reach opposite results after initially determining non-willfulness under Title 31, is arbitrary and capricious and legally inappropriate.

## III.   The FBAR Penalties Violate the Eighth Amendment

The Eighth Amendment of the U.S. Constitution provides that the government cannot impose "excessive fines." U.S. Const. amend. VIII.  This Court reviews the FBAR assessments under the Eighth Amendment *de novo*. *Davis v. U.S.,* No. 16-CR-80004, 2018 WL 1136612 (S.D. Fla. Mar. 1, 2018)*; U.S. v. Villanueva,* 716 Fed. Appx. 928 (11th Cir. 2018). Assuming arguendo, Isac willfully violated his FBAR obligations, the amounts of the penalties should nevertheless be set aside to extent they are violate the Eighth Amendment.

16

Prior to 2005, the maximum penalty that could be imposed for a willful violation of FBAR was $100,000. 31 U.S.C. § 5321(a)(5) (amended 1986 to allow for the imposition of penalties). In 2004, Congress increased the statutory penalty to the greater of $100,000 or 50% of the balance in the account. American Jobs Creation Act of 2004, Pub. L. 108-357, 31 U.S.C. § 5321(a)(5)(C) (2004). Congress provided no specific reason for increasing the willful penalty and there is no evidence that Congress considered any Constitutional constraints on the increase. S. Rep. 108-357 at 32.

While raised in a handful of FBAR cases, there are no cases reducing FBAR penalties significantly under the Eighth Amendment; however, there are likewise no cases seeking to impose such steep FBAR penalties under facts similar to the present case. Isac argues that not only does the Eighth Amendment apply, but also that the $15,599,072 penalty is excessive, a fact that Bjork admitted in his testimony. (SOF ¶ 83.)

### A.     The FBAR Penalties are Subject to Constraints of Eighth Amendment

The seminal cases of *Austin v. U.S.* and *U.S. v. Bajakajian* make clear that the Eighth Amendment applies to actions of the government when such actions are punitive, i.e. punishment; the label given to the action does not control. *Austin v. U.S., 509 U.S. 602 (1993)*; *U.S. v. Bajakajian,* 524 U.S. 321 (1998*)*. Deterrence is punitive in nature. *Bajakajian* at 329; *Austin* at 610-18. Of the FBAR cases in which the Eighth Amendment was raised, only one rejects its application.[13]

### B.     The FBAR Penalties are Grossly Disproportionate

Once applicable, determining whether the Eighth Amendment has been violated rests on an analysis of the proportionality of the fine as compared to the conduct it seeks to punish. If "grossly disproportional," then the fine cannot stand. *Bajakajian* at 337.

There is no established bright line in determining whether a penalty is excessive, perhaps the most thorough FBAR case is *Bussell*. *U.S. v. Bussell*, 2015 U.S. Dist. Lexis 175952; *U.S. v.*

---

[13]  The Eighth Amendment claim was addressed in the following cases: *U.S. v. Garrity*, 187 F. Supp. 3d 350 (D. Conn. 2016); *Moore v. U.S.*, No. C13-2063RAJ, 2015 U.S. Dist. Lexis 43979 (W.D. Wash. Apr. 1, 2015); *U.S. v. Katholos,* No. 17-cv-00531, 2018 U.S. Dist. LEXIS 146743 (W.D.N.Y. Aug. 28, 2018); *U.S. v. Bussell*, No. CV 15-02034 SJO (VBKx), 2015 U.S. Dist. LEXIS 175952 (C.D. Cal. Dec. 8, 2015). The recent case of *Estate of Schoenfeld* is an outlier in its rejection.  *U.S. v. Estate of Schoenfeld*, 344 F. Supp 3d 1354 (M.D. Fla. 2018). In *Estate of Schoenfeld*, the court rejected the application of Bajakajian, but did not specifically appear to reject the applicability of the Eight Amendment. *Id*. at 1375.

*Bussell*, 699 Fed. App'x. 695 (9th Cir. 2017), *cert. denied* 138 S. Ct. 1697 (2018). The *Bussell* court considered the factors presented in *Bajakajian*: (1) the nature and extent of crime (2) whether the violation was related to other illegal activities (3) the other penalties that may be imposed, and (4) extent of the harm caused.   *Bussell* at *21, citing *Bajakajian* at 337.

Letania Bussell funneled money made from her Beverly Hills dermatology practice into a Swiss bank account.  *Bussell* at *2-3.  She was criminally convicted of several crimes including tax evasion. *Id*. at *6. The court found the first two factors neutral, in part because Bussell could not meet her burden that the money at issue was obtained from legal sources. *Id*. at *23. Unlike Bussell, Isac is no criminal. Moreover, the source of the foreign accounts were all lawful gifts of Swiss-situs funds in Switzerland made by his Swiss-based father. (SOF ¶ 15.)

Unlike the facts of the present case, the *Bussell* court considered her failure to report the interest earned on the foreign account as a tax loss on the public and that was a significant harm to the government. *Bussell* at *24. Unlike *Bussell*, Isac caused no fraud on the U.S. because there is no payment owed the government in connection with filing an FBAR, and Isac voluntarily paid the tax, interest and an accuracy-related penalty and to compensate the government. Similar to *Bajakajian*, there was no "loss to the public fisc." *Bajakajian* at 337-39.

The *Bussell court* ultimately found that the $1.2 million FBAR penalty violated the Eighth Amendment and reduced the penalty to the statutory maximum. *Bussell* at *24-25. However another important distinction is present, also weighing in favor of a finding of gross disproportion in Isac's case. In *Bussell* the undisclosed foreign account resulted in one FBAR penalty. In Isac's case, the IRS has interpreted the statute to impose multiple penalties on the same foreign account.[14] Stated another away, in Isac's case the same dollars generated multiple penalties (one for every year).

When weighing the relevant factors and comparing the FBAR penalties to the additional tax due as a result of his failure to account for interest earned from the foreign accounts, it is clear that the penalties are grossly disproportional, and Bjork's testimony that they were "excessive" makes sense:

---

[14] Whether one foreign account can generate multiple FBAR penalties is currently an issue in Appeal Docket No. 19-55585, where it awaits decision by the 9th Circuit; see also *U.S. v. Boyd*, 123 A.F.T.R. 2d 2019-1651 (CD CA 2019).

|  | Additional Tax Due | FBAR Penalty | Percentage |
|---|---|---|---|
| 2006 | $20,475 | $1,173,778 | 5732% |
| 2007 | $128,227 | $4,185,271 | 3264% |
| 2008 | $327,020 | $4,185,271 | 1279% |
| 2009 | $292,284 | $4,185,271 | 1432% |

(SOF ¶ 80.) Similarly, in weighing the relevant factors and comparing the average account balances of the foreign accounts at issue and cumulative FBAR penalties associated with such accounts, it is clear that the penalties are grossly disproportional. Some of the more egregious examples are as follows:

| Account | Years | Average Maximum Balance Range | FBAR Penalty | Percentage |
|---|---|---|---|---|
| UMB - 54201 | 2006-2008 | $634,792 | $541,127 | 85% |
| UBS - 19250 | 2006-2008 | $5,497,461 | $3,775,098 | 69% |
| AARGAUISCHE - 32002 | 2006-2009 | $15,979 | $10,681 | 67% |
| UBS - 66308 | 2006-2008 | $4,112,079 | $2,648,546 | 64% |

(SOF ¶ 81.)

The numbers appear even more excessive when considering that Bjork and his supervisor Anderson initially held that Isac was non-willful, and if sustained the non-willful FBAR penalty would have been $221,394 for the years at issue, not the $15 million now sought. (SOF ¶¶ 56, 62.) For these reasons, even assuming *arguendo* Isac willfully violated his FBAR obligations, the amounts of the penalties should not stand under the Eighth Amendment of the U.S. Constitution because they are excessive.

## IV.   The FBAR Penalty Assessments Against Isac Are Time Barred

The FBAR assessment period extension requests are not statutorily authorized under Title 31 of the United States Code; thus the IRS's assessments against Isac are time barred. FBAR civil penalties may be assessed at any time **before** the end of the six-year period beginning on the date of the transaction. 31 U.S.C. § 5321(b)(1) (emphasis added). Isac's 2009 FBAR was due June 30, 2010; consequently, any FBAR civil penalty for 2009 must have been assessed by June 30, 2016 to be valid.[15] The IRS assessed FBAR civil penalties against Isac on September 6, 2016, which is not within the Title 31 six-year statutory assessment period. (SOF ¶ 61.)

---

[15] Pursuant to the six-year statute of limitations, the FBAR civil penalties for the 2006, 2007, and 2008 filing years must have been assessed by June 30, 2013, June 30, 2014, and June 20, 2015, respectively.

The IRS must operate within the Title 31 statutory framework with respect to FBAR enforcement. Title 31 has no statutory provision for extending the assessment period, which is in contrast to Title 26, which grants the IRS statutory authority to extend the time period to assess *tax imposed under Title 26*. *See* 26 U.S.C. § 6501(c)(4) (2018) (emphasis added). The IRS administers and enforces FBAR under redelegation from FinCEN, and thus cannot unilaterally adopt rules created specifically for Title 26 and force them on taxpayers for Title 31 FBAR purposes.

Neither the Treasury Department nor FinCEN were authorized to extend the FBAR penalty assessment period beyond six years and could not have conferred such authority on the IRS; thus, the IRS exceeded its delegated authority in seeking FBAR statute of limitations extensions from Isac. Treasury Order 180-01 delegates FBAR enforcement to FinCEN and states, in pertinent part, "[t]he Director [of FinCEN] is hereby delegated authority to…administer the provisions of [the Bank Secrecy Act], which is codified at … 31 U.S.C. 5311 *et seq*." See Treasury Order 180-01, 67 Fed. Reg. 64697 (Sept. 26, 2002). FinCEN subsequently redelegated FBAR enforcement authority to the IRS. *See* Memorandum of Agreement and Delegation of Authority for Enforcement of FBAR Requirements (Apr. 2, 2003).

Specifically, FinCEN delegated to the IRS the authority to enforce the provisions of 31 U.S.C. §§ 5314 and 5321, 31 C.F.R. §§ 103.24, 103.32, 103.57, and other related provisions. *Id.* The statutes and regulations for which the IRS was delegated FBAR enforcement authority are simply the BSA provisions requiring FBAR reports and the civil penalties for failure to file such reports, along with the implementing regulations to same. Nothing in FinCEN's redelegation of FBAR enforcement to the IRS authorizes any FBAR assessment beyond the Title 31 six-year statute of limitations.

The Treasury Department had no such authority to delegate to FinCEN. And therefore FinCEN had no such authority to redelegate to the IRS. Thus the FBAR penalties are time barred.

## CONCLUSION

In many ways, this case is a matter of first impression. Unlike other FBAR cases, Isac was trying in good faith to comply by filing FBARs and had good reason to have foreign accounts. Isac submits that based on undisputed facts he is entitled to summary judgment.

Dated: July 10, 2019

Respectfully submitted,

*/s/ Jose A. Casal*
JOSE A. CASAL
Florida Bar No. 767522
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone      (305) 789-7713
Facsimile      (305) 789-7799
Jose.Casal@hklaw.com

NICOLE M. ELLIOTT
Admitted *Pro Hac Vice*
Holland & Knight LLP
800 17th Street NW, Suite 1100
Washington, DC 20006
Telephone      (202) 469-5144
Facsimile      (202) 955-5564
Nicole.Elliott@hklaw.com

WILLIAM M. SHARP, SR.
Florida Bar No. 341452
ANDREA DARLING de CORTES
Admitted *Pro Hac Vice*
CHAD M. VANDERHOEF
Florida Bar No. 109595
Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602
Telephone      (813) 227-6387
Facsimile      (813) 229-0134
William.Sharp@hklaw.com
Andrea.Cortes@hklaw.com
Chad.Vanderhoef@hklaw.com

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 10, 2019, I electronically filed the foregoing document with the clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on counsel of record identified via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ <u>*Jose A. Casal*</u>
Jose A. Casal
