**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-81147-BLOOM/Reinhart**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ISAC SCHWARZBAUM,

     Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a five-day bench trial that commenced on October 2, 2019 and ended on October 11, 2019. The parties submitted their closing arguments in writing and proposed findings of fact and conclusions of law following the filing of the trial transcripts. *See* ECF No. [83] (Defendant's Proposed Findings of Fact and Conclusions of Law); ECF No. [84] (Plaintiff's Proposed Findings of Fact and Conclusions of Law). The Court has carefully considered the evidence presented at trial, the applicable law, and the parties' submissions, including the parties' rebuttals, ECF Nos. [87], [88-1]. Set forth below are the Court's relevant findings of fact and conclusions of law.

## I.    INTRODUCTION

This case involves an attempt by the United States of America ("USA") to collect outstanding civil penalties assessed against Isac Schwarzbaum ("Schwarzbaum") for his alleged willful failure to timely file a complete and accurate Report of Foreign Bank and Financial Accounts ("FBAR"), Form TD F 90-22.1, as required by 31 U.S.C. § 3514 for tax years 2006, 2007, 2008 and 2009. *See generally*, ECF No. [1] ("Complaint"). In the Complaint, the USA

asserts four counts seeking to reduce to judgment the previously assessed FBAR penalties for each applicable year (2006-2009), pursuant to 31 U.S.C. § 5321(a)(5), as well as interest and late payment penalties pursuant to 31 U.S.C. §§ 3717 (a)(1) and (e)(2). The IRS assessed FBAR penalties against Schwarzbaum for 2006 through 2009 in the amount of $13,729,591.00. The central issue in this case is whether Schwarzbaum's failure to comply with the FBAR reporting requirements for tax years 2006 through 2009 was willful.

## I.  FINDINGS OF FACT

### A. Schwarzbaum's background

Schwarzbaum was born in Germany in 1955, and has lived in Germany, Spain, the United States, Costa Rica, and Switzerland. His assets are derived from his father's gifts and bequests. His father became successful in the textile business in Stuttgart, Germany, and then later in real estate. In the early 1990s, Schwarzbaum's parents left Germany for Switzerland. At the time, Schwarzbaum's father sold his businesses and had accumulated between $60 and $70 million, which continued to grow. In Switzerland, Schwarzbaum's father kept his money in a number of accounts at Swiss banks in order to diversify his wealth. Schwarzbaum received his first large gift from his father in 2001, when his father transferred an existing Swiss bank account into Schwarzbaum's name. In 2007, he received another large gift from his father.

Schwarzbaum received his high school diploma in Germany. He was not a strong student academically and did not take any courses in accounting, investing, or law. He thereafter completed a real estate internship in Germany and worked in real estate leasing. He then moved to Spain, where he opened a gym and worked in real estate sales and commercial real estate leasing. He speaks English, as well as German, Spanish, Hebrew, Portuguese and Yiddish. He received his real estate agent license in the United States sometime in the 1990's. He also formed several

corporations in the United States, including U.S. World Publishing Group, U.S. World Trade, Inc., and Global Research Marketing Group. From 1993 to 2010, he spent part of each year in Costa Rica, part in Switzerland, and part in the United States. Schwarzbaum moved to the United States in 1993 but spent most of his time in Costa Rica because his girlfriend lived there. Schwarzbaum became a legal permanent resident of the United States in 1995, and a United States citizen in 2000. In September of 2010, Schwarzbaum moved and lived full time in Switzerland, eventually returning to live in the United States in 2016.

Schwarzbaum is a single father of two children. His son was born in 2007 and his daughter was born in 2009. Both children were born via surrogacy. Schwarzbaum traveled back and forth to California in 2006 and 2007 and again in 2008 to 2009 for the surrogacy process involving his children.

Schwarzbaum depended on his father for financial support while his father was alive and has lived off his father's bequests following his father's death in 2009. For many years, Schwarzbaum received between $100,000.00 and $200,000.00 per year from his father. In 2001, the pattern changed. Beginning in 2001, Schwarzbaum had an interest in certain financial accounts located in Switzerland. In 2004, Schwarzbaum opened foreign accounts in Costa Rica. His father began giving him large sums of money in 2001, when Schwarzbaum's father signed over one of his Swiss bank accounts, at Bank Raiffeisen, which contained approximately $3 million. Schwarzbaum kept the money invested in the same manner that his father had it invested. After his father's death, the money continued to be managed by the bankers based upon his father's instructions to keep the money conservatively. Schwarzbaum never directed how the money should be invested, nor did he disagree with a recommendation made by the bankers.

### B.  CPAs

Schwarzbaum always utilized certified public accountants ("CPAs") to prepare his United States tax returns. Brian Gordon ("Gordon") was the CPA who prepared Schwarzbaum's U.S. tax returns from approximately 1995 through 2005. Doris Shaw ("Shaw") was the CPA who prepared his tax return for tax year 2006. Gilman & Ciocia was the firm that prepared his tax returns for tax years 2007 through 2009. An individual named Robert Silver, who was Steve Weitz's ("Weitz") assistant and also a CPA seasonally employed at Gilman & Ciocia, prepared Schwarzbaum's 2007 tax return, and Weitz prepared Schwarzbaum's 2008 and 2009 returns.

At some point prior to the tax years at issue, Schwarzbaum told Gordon that his father supported him financially and that he was living off his father's gifts. When he told Gordon about the 2001 gift from his father, Gordon told him that since the assets were outside the U.S., there were no reporting requirements. Schwarzbaum told Gordon about subsequent gifts each year. Gordon never filed a FBAR or Schedule B to Form 1040, nor did he provide Schwarzbaum with a tax planner or organizer. Gordon told Schwarzbaum that gifts from a non-U.S. source were not taxable. However, Gordon did not tell Schwarzbaum that he did not have to pay taxes on any interest earned on a gift from a non-U.S. source. Schwarzbaum did not tell Gordon specifically about his interest in the Bank Raiffeisen account, nor did he tell Gordon about his Costa Rican bank account. Similarly, when Schwarzbaum told Shaw about the money he received from his family in Switzerland, she told him that gifts are not reportable, unless there is a U.S. connection. Schwarzbaum testified that in the years that Gilman & Ciocia prepared his tax returns, he met with Weitz once each year and took documents with him to the meeting. The tax return was prepared, Schwarzbaum received a letter saying how much he owed, and he then paid the amount. Schwarzbaum signed a form consenting to allow his return to be filed electronically and did not

review his return with Weitz prior to filing. Schwarzbaum never hired anyone to translate or interpret the tax returns for him, and he never discussed whether he had to pay taxes on interest earned on non-U.S. accounts. Nobody ever told him that he did not have to pay taxes on the interest earned on non-U.S. accounts.

### C.  Foreign accounts

The USA presented evidence that for tax years 2006 through 2009, Schwarzbaum had an interest in eleven (11) Swiss bank accounts, including Aargauische Kantonalbank, two accounts at Union Bank of Switzerland, United Mizrahi Bank, Raiffeisen, Bank Linth, Banca della Swizzera Italiana, Clariden Leu, St. Galler Kantonalbank, Societe Generale, and Banca Arner. During the relevant years, Schwarzbaum also had an interest in two accounts at Scotiabank De Costa Rica in Costa Rica.

| Bank Name | Last 4 Digits of Account No. | Date Opened | Date Closed |
|---|---|---|---|
| Aargauische Kantonalbank | 2002 | Nov. 2003 | Open as of Mar. 2011 |
| Union Bank of Switzerland ("UBS") | 6308 | Mar. 2004 | June 2008 |
| United Mizrahi Bank ("UMB") | 4201 | Mar. 2004 | Oct. 2010 |
| UBS | 9250 | Apr. 2005 | June 2008 |
| Raiffeisen | 0824 | Mar. 2008 | Nov. 2009 |
| Bank Linth | 2004 | June 2008 | Oct. 2010 |
| Banca della Swizzera Italiana ("BSI") | 2142 | June 2008 | Open as of Mar. 2011 |
| Clariden Leu | 1119 | June 2008 | Nov. 2010 |
| St. Galler Kantonalbank | 1000 | June 2008 | Open as of Mar. 2011 |
| Societe Generale ("SG") | 0302 | Oct. 2009 | Dec. 2010 |
| Banca Arner | 5228 | Nov. 2009 | Nov. 2010 |
| Scotiabank De Costa Rica S.A. ("Scotiabank") | 1472 | 2004 | 2009 |
| Scotiabank | 0588 | 2006 | 2009 |

The USA also presented evidence that in opening several of the Swiss bank accounts, Schwarzbaum elected to have the banks retain his correspondence for a fee, assigned his accounts pseudonyms, and selected the option to refrain from investing in U.S. stocks. In addition, Schwarzbaum used his German passport to open several additional Swiss accounts, rather than his American passport.

### D.  2006 tax return

In 2007, Schwarzbaum retained Shaw to prepare his tax return for the 2006 tax year. Schwarzbaum switched to Shaw for tax preparation services because he was not living in Miami and Gordon's office was in Miami. When he met with Shaw in 2007, he told her that he received gifts from his father and that his main residence was in Costa Rica. He brought bank documents and previous tax returns with him. He informed Shaw about his interest in one Costa Rican account (at Scotiabank). He also had interests in Swiss bank accounts, as detailed in the chart above, but those were not reported on Schedule B.

According to the USA, Schwarzbaum was required to report his interest in accounts at UBS (9250 and 6308), UMB (4201), Aargauische, and Scotiabank (0588 and 1472) on his 2006 FBAR. According to Schwarzbaum, when he told Shaw about the money he received from his family in Switzerland, Shaw told him that gifts are not reportable, unless there is a U.S. connection. Schwarzbaum's understanding from this advice was that if money came from a country outside the U.S., or was going out from the U.S. into another country, it is reportable. Schwarzbaum testified that, based upon his personal experience in the countries he has lived, taxation is based on residency, and not citizenship. As a result, Schwarzbaum testified that Shaw's advice made sense to him based on his background.

His 2006 tax return was the first time that Schwarzbaum had a Schedule B included as a part of his tax return. Shaw also prepared a FBAR for his 2006 tax year that reported interest in one Scotiabank account, even though Schwarzbaum had an interest in two accounts at Scotiabank. According to Schwarzbaum, this was because, in the one account he did report, money was sent from the U.S. to the Scotiabank account in Costa Rica, and thus had a U.S. connection. In addition, Shaw prepared a Form 3520, reporting additional gifts Schwarzbaum had received from his father. Schwarzbaum did not tell Shaw specifically about his interest in any Swiss bank accounts, and did not ask Shaw if he had to report his Swiss accounts in Schedule B to his 2006 Form 1040. According to Schwarzbaum, he did not discuss his Swiss accounts with Shaw because there was no U.S. connection. The first time he learned about a Schedule B and the FBAR was in 2006.

**E.  2007 tax return**

For his 2007 taxes, Schwarzbaum did not work with Shaw as he had become a first-time father and wanted someone closer to his home in Boca Raton. In 2008, Schwarzbaum hired Weitz, a new tax preparer at Gilman & Ciocia. Gilman & Ciocia prepared his tax returns for tax years 2007, 2008 and 2009. He met with Weitz each year to have his tax returns prepared. For the 2007 and 2008 tax years, Schwarzbaum did not disclose that he had an interest in any Swiss accounts to Weitz, though he remembers that he gave Weitz a copy of his 2006 tax return and a bank statement from Scotiabank.

According to the USA, Schwarzbaum was required to report his interest in accounts at UBS (9250 and 6308), UMB (4201), Aargauische, and Scotiabank (0588 and 1472) on his 2007 FBAR. Weitz testified that he was not aware of a FBAR filed by Shaw for Schwarzbaum, nor did Schwarzbaum ask him for a referral to someone who could complete a FBAR. Weitz also testified that he did not ask Schwarzbaum about foreign accounts. Schwarzbaum remembers disclosing his

Scotiabank account, but the interest received from it was not reported on Schedule B. At the time, the tax preparation software used by Weitz defaulted to "no" on question 7a of Schedule B, which asked "[a]t any time during [applicable tax year], did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?"

Despite Schwarzbaum's testimony that none of his tax preparers asked him about foreign accounts, Schwarzbaum self-prepared and filed a FBAR for the 2007 tax year disclosing the 1472 Scotiabank account. The only account Schwarzbaum reported on his 2007 FBAR was his interest in the 1472 Scotiabank account. According to Schwarzbaum, Weitz told him to copy over the information from his 2006 FBAR. The FBAR Schwarzbaum prepared did not report any accounts other than the 1472 Scotiabank account, although he testified that he reviewed the instructions for the form to the best of his abilities.

Schwarzbaum also self-prepared a Form 3520 for tax year 2007, in which he reported a $5,065,000.00 gift his father wired him to the United States upon the birth of his son. While he also received a monetary gift which was deposited directly into his UBS account in Switzerland, according to Schwarzbaum, he did not report it because it had no U.S. connection.

**F.  2008 tax return**

As he had done in 2006 and 2007 prior to the birth of his son, Schwarzbaum was traveling back and forth to California in 2008 and 2009 for the surrogacy process involving his daughter. In May of 2009, Schwarzbaum was hospitalized for a quintuple bypass following a heart attack. He was told he would need to recover for three months. Shortly after suffering his heart attack, Schwarzbaum's father called him to tell him that something was not right, and he learned that his father was ill. Schwarzbaum's father died in July of 2009 in Israel, one day before Schwarzbaum

arrived to see him. Schwarzbaum then traveled to Switzerland to attend to his family affairs, and returned to the United States in October of 2009, a few weeks before his daughter was born. As a result of these events, Schwarzbaum testified that he did not file a FBAR for 2008 until December, 2011.

According to the USA, Schwarzbaum was required to disclose his interest in accounts at UBS (9250 and 6308), UMB (4201), Bank Linth, BSI, Clariden Leu, St. Galler, Raiffeisen (0824), Aargauische, and Scotiabank (0588 and 1472) on the 2008 FBAR. The late-filed 2008 FBAR reported Schwarzbaum's interest in UBS accounts 9250 and 6308, UMB account 4201, Bank Linth, BSI, Clariden Leu, St. Galler, Raiffeisen account 0824, Aargauische, and Scotiabank accounts 0588 and 4172.

### G.  2009 tax return

According to the USA, Schwarzbaum was required to file a FBAR reporting his interest in accounts at UMB (4201), Bank Linth, BSI, Clariden Leu, St. Galler, Raiffeisen (0824), Banca Arner, Aargauische, SG, and Scotiabank (0588 and 1472) for tax year 2009.

For tax year 2009, Schwarzbaum disclosed his interest in the SG account in Switzerland, which at the time was his largest Swiss account. He testified that he disclosed it because he made multiple transfers to it from American accounts, and thus, the SG account had a U.S. connection. The transfers were related to Schwarzbaum's decision to move his family back to Switzerland in 2009. Schwarzbaum did not disclose his interests in any other Swiss accounts. He also reported both Scotiabank accounts, which he testified he told Weitz were foreign accounts. Nevertheless, question 7a on Schedule B was marked as "no." As he did for his 2007 taxes, Schwarzbaum self-prepared the FBAR for tax year 2009, on which he reported both a Scotiabank account and the SG account in Switzerland.

### H.  UBS letter

Schwarzbaum was sent a letter from UBS dated September 25, 2009, which he received on October 3, 2009. In the letter, UBS informed Schwarzbaum that he appeared to be an account holder whose account at UBS was within the scope of an IRS treaty request. The letter sought information about accounts of certain U.S. persons owned directly or through offshore companies and maintained with UBS. The letter also set forth several options available to him in connection with the treaty request, including consenting to the transmittal of the information to the IRS, appointing an agent in Switzerland, and participating in the IRS's Offshore Voluntary Disclosure Initiative ("OVDI"). The letter also encouraged him to consult with a U.S. qualified tax advisor.

Schwarzbaum did not consult with a U.S. tax advisor about the letter. Instead, he sought advice through Swiss counsel. He testified that he was confused about the letter because he closed the UBS account in 2008. Although Weitz prepared his 2009 taxes, Schwarzbaum did not show or tell Weitz about the UBS letter. Ultimately, his Swiss lawyer, Dr. Daniel Fischer, told him that the letter did not apply to him. Dr. Fischer is not a qualified U.S. tax advisor. Although the UBS letter had encouraged him to consult with a qualified U.S. tax advisor, Schwarzbaum did not. Instead, Dr. Fischer appealed the Swiss Federal Tax Administration's decision as to how to respond to the UBS letter. After the appeal was denied, Schwarzbaum consulted U.S. counsel and decided to make a voluntary disclosure to the IRS.

### I.  OVDI program

According to Schwarzbaum's counsel, they became aware of reporting issues when Schwarzbaum consulted them prior to his move back to Switzerland in 2010. This was the point at which Schwarzbaum first realized he had FBAR issues. He testified that he was upset and angry because he had been advised so wrongly by so many people. As part of Schwarzbaum's

participation in the OVDI program, Schwarzbaum disclosed his financial holdings, including seventeen (17) accounts in Switzerland and four (4) accounts in Costa Rica for the years 2003 to 2010. Ultimately, Schwarzbaum decided to opt out of the OVDI program, and his case was referred for an investigation into his compliance with foreign reporting requirements.

### J.   IRS investigation

Erik Anderson was the supervisory internal revenue agent at the IRS who was involved in the IRS examination of Schwarzbaum's foreign account reporting in 2013 and 2014. As a supervisory agent, he approves letters, penalties and case closures. Generally, as part of the examination process, the revenue agent interviews the taxpayer and may interview preparers or other third parties depending on the issues in the case. After the interview, a revenue agent conducts any necessary contact with third parties and develops the record before drafting a lead sheet with penalty conclusions. In the general penalty approval process, the revenue agent develops a lead sheet and penalty, which are given to Anderson for approval. Anderson would review the lead sheet and, if changes were needed, he would send the lead sheet back to the agent. If no changes were needed, he would forward it to the technical advisors. The lead sheet then goes to the offshore technical advisor inbox to be reviewed for consistency and to ensure that the IRS is treating similarly situated taxpayers in the same manner. The lead sheet outlines the IRS's conclusion, the facts and position in law, and it outlines the proposed amounts for adjustment per year. In a willful FBAR case, IRS counsel must also be in agreement with the examination's determination. IRS counsel utilizes the Internal Revenue Manual ("IRM") for guidance in applicable penalties. When IRS counsel approves, the findings are communicated to the taxpayer and he receives a copy of the lead sheet.

When Schwarzbaum opted out of the OVDI settlement structure, his case was transferred to Anderson's office in Milwaukee, where Anderson is the group manager. The case was assigned to revenue agent James Bjork. Schwarzbaum cooperated with the IRS's investigation. Anderson testified that in Schwarzbaum's case, the focus of the recommended examination was on foreign issues and foreign compliance, inclusive of the FBAR. Anderson testified that he sat in on the interview with Schwarzbaum, but the primary reason he was there was to evaluate Agent Bjork.

Bjork initially recommended that Schwarzbaum be assessed a non-willful penalty. Anderson initially agreed with Bjork's non-willful recommendation. In response, Clinton West ("West"), the offshore technical advisor, suggested via email that some of the factors on the lead sheet appeared to resemble willful as opposed to non-willful behavior. In response to West's email, Bjork, Anderson and West had a conference call about Schwarzbaum, during which they came to an agreement that his case fit more in line with a willful penalty than with Bjork's initial non-willful recommendation. As a result, Bjork revised the lead sheet to recommend the assessment of a willful penalty. The willful lead sheet was approved by Anderson and West, and then sent to IRS counsel. Ultimately, the IRS determined that Schwarzbaum's FBAR violations for years 2006, 2007, 2008, and 2009 were willful.

Anderson testified that in general, the statutory willful penalty is either $100,000.00 or half of each account balance. However, the FBAR penalty assessment permits mitigation of penalties. In order to be assessed a mitigated penalty, a taxpayer must meet four criteria: 1) no prior FBAR assessments; 2) no tax convictions in the last ten years; 3) no funds from illegal sources; and 4) no civil penalty asserted. In Schwarzbaum's case, the penalty computation worksheet from the OVDI disclosure was used to compute the FBAR penalty. The initial mitigated penalty was deemed to be excessive at $35.4 million, and it was then further mitigated. However, at the time, there was

no official IRS guidance on further mitigation. In order to further mitigate the penalty in Schwarzbaum's case, the IRS took the highest year's FBAR mitigated penalty, and spread it across the other years, arriving at the $13,729,591.00 penalty amount.

## II.    CONCLUSIONS OF LAW

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, referred to as the Bank Secrecy Act (BSA), 31 U.S.C. §§ 5311, *et seq*. *See* Pub. L. No. 91-508, 84 Stat. 1114 (1970). The primary purpose of the BSA was to require the making of certain reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." *Id*. § 202. To effectuate this purpose, the BSA directs the Secretary of the Department of Treasury to promulgate regulations requiring the reporting of information from United States persons who have relationships, or conduct transactions, with foreign financial agencies. *See id.* § 241(a) (codified at 31 U.S.C. § 5314). As relevant here, the regulations require "each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country" to file a FBAR. *See* 31 C.F.R. § 1010.350(a). The FBAR is required "with respect to foreign financial accounts exceeding $10,000.00 maintained during the previous calendar year." *See* 31 C.F.R. § 1010.306(c).

The authority to assess and collect civil penalties for FBAR requirement non-compliance rests with the IRS. *See* Delegation of Enforcement Authority Regarding the Foreign Bank Account Report Requirements, 68 Fed. Reg. 26489 (May 16, 2003). The BSA did not originally contain a civil penalty provision for failing to comply with the FBAR requirements, *see* Pub. L. No. 91-508, 84 Stat. 1114 (1970), but Congress added one in 1986. *See* Money Laundering Control Act of 1986, Pub. L. No. 99-570, Subtitle H, 100 Stat. 3207, § 1357 (October 27, 1986). FBAR penalties may be either willful or non-willful. *See* 31 U.S.C. § 5321(a)(5).

In this case, the USA assessed a willful penalty of $13,729,591.00, in addition to late payment penalties and accrued interest. Schwarzbaum does not contest that he had interests in foreign financial accounts that required disclosure and the filing of a FBAR for each tax year at issue, or that he violated those requirements. Rather, he argues that his violations were not willful and he should therefore not be subject to a willful FBAR penalty.

In order to be subject to a willful FBAR penalty, the following elements are required: (1) the person must be a U.S. citizen; (2) the person must have or had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period; and (4) the person must have willfully failed to disclose the account and file a FBAR. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a). The Court reviews the evidence *de novo*. *U.S. v. Williams*, No. 09-437, 2010 WL 3473311, at *1 (E.D. Va. Sep. 1, 2010), *rev'd on other grounds*, 489 F. App'x 655 (4th Cir. 2012) (quoting *Eren v. Comm'r*, 180 F.3d 594, 597-598 (4th Cir. 1999)).

The statutes and regulations at issue in this case do not define the term willful; however, the BSA identifies the applicable penalty as a "civil money penalty." 31 U.S.C. § 5321(a)(5)(A). "[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).[1] "While the term recklessness is not self-defining, the common law

---

[1] Schwarzbaum expends a great deal of briefing to argue that a willful violation may only include a knowing and intentional violation. *See* ECF No. [83]. However, Schwarzbaum himself recognized in his Motion for Summary Judgment that a finding of willfulness may be based upon recklessness or willful blindness, *see* ECF No. [47], and his counsel at trial conceded in his opening statement that recklessness is sufficient. *See* ECF No. [77] at 19 ("The Government has the burden to prove that Isac Schwarzbaum, one, willingly violated his obligation to timely file complete and accurate FBARs, that included his Swiss accounts, for reporting years 2006 through 2009. Or two, that he was reckless after being notified of this filing obligation."). Moreover, the relevant case law supports the conclusion that willfulness in the FBAR context includes recklessness. *See, e.g., Bedrosian v. United States*, 912 F.3d 144, 152-53 (3d Cir. 2018); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204-05 (D. Utah 2012).

has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed 2d 811 (1994)) (internal quotations omitted). In the FBAR context, willfulness "may be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information,' and it 'can be inferred from a conscious effort to avoid learning about reporting requirements.'" *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012) (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)); *United States v. Bohanec*, 263 F. Supp. 3d 881, 888-89 (C.D. Cal. 2016) (holding that willfulness under § 5321 can be shown through "reckless disregard of a statutory duty"). In addition, "'willful blindness' may be inferred where 'a defendant was subjectively aware of a high probability of the existence of a tax liability and purposefully avoided learning the facts pointing to such liability.'" *Williams*, 489 F. App'x at 658 (quoting *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011)).

Willfulness in the context of a FBAR violation does not require actual knowledge of the duty to report interest in a foreign account. *United States v. Brandt*, No. 17-80671-CIV, 2018 WL 1121466, at *4 (S.D. Fla. Jan. 24, 2018); *see also Williams*, 489 F. App'x at 658.

## III.   DISCUSSION

### A.  Schwarzbaum did not knowingly violate the FBAR reporting requirements

As a preliminary matter, the Court notes that in attempting to satisfy its burden in this case, the USA relies heavily on the notion from case law that a taxpayer is charged with knowledge of the information on a tax return by virtue of signing it under penalties of perjury. *See United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000) (defendant can be charged with knowledge of the contents of a tax return by signing a fraudulent form); *Williams*, 489 F. App'x at 659 (tax payer's signature is prima facie evidence that he knew the contents of the return and line 7a's

instruction for exceptions and filing requirements for FBAR put taxpayer on inquiry notice of the FBAR requirement); *Norman v. United States*, 942 F.3d 1111, 1116 (Fed. Cir. 2019) (a tax payer who signs a return is charged with constructive knowledge of its contents) (citing *Greer v. Comm'r of Internal Revenue*, 595 F.3d 338, 347 n.4 (6th Cir. 2010); *Jarnagin v. United States*, 134 Fed. Cl. 368, 378 (Fed. Cl. 2017) ("any individual exercising ordinary business care and prudence would have made inquiry of their accountant about the FBAR filing requirements after having identified the clear error in the response provided to question 7a); *McBride*, 908 F. Supp. at 1206 ("It is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS.").

However, upon review, the Court agrees with the recent decision in *United States v. Flume*, No. 5:16-CV-73, 2018 WL 4378161, at *7 (S.D. Tex. Aug. 22, 2018), that the theory of constructive knowledge is unpersuasive in this instance. Imputing constructive knowledge of filing requirements to a taxpayer simply by virtue of having signed a tax return would render the distinction between a non-willful and willful violation in the FBAR context meaningless. Because taxpayers are required to sign their tax returns, a violation of the FBAR filing requirements could never be non-willful. Yet, the statute provides for non-willful penalties. Applying the USA's suggested reasoning would lead to a draconian result and one that would preclude a consideration of other evidence presented. Accordingly, the USA cannot satisfy its burden of proof in this case on the issue of willfulness simply by relying on the fact that Schwarzbaum signed his tax returns or neglected to review them as thoroughly as he should have.[2]

---

[2] Moreover, the evidence in this case supports a finding that at least with respect to tax years 2007 and 2009, Schwarzbaum did not review his returns prior to filing, nor did he sign those returns before they were filed. According to Weitz, returns were filed electronically, and Schwarzbaum testified that each year he received a letter from Weitz informing him that his tax return had been filed, and the amount he owed in taxes, which Schwarzbaum paid. With respect to tax year 2008, Schwarzbaum's testimony is inconsistent. He testified at his deposition that he believed that he signed his 2008 tax return and reviewed the form to

The USA presented additional evidence to demonstrate that Schwarzbaum's FBAR violations were knowing, including his efforts to prevent foreign banks from disclosing his account information to the IRS by using account pseudonyms, instructing several Swiss banks not to invest in U.S. securities, not to disclose his identity, to retain his correspondence, and his failure to consult with a U.S. tax professional in response to the UBS letter.

However, in these particular circumstances, the Court is not persuaded that Schwarzbaum's elections in opening Swiss bank accounts or his response to the UBS letter reflect a knowing intention to hide such accounts. As previously noted, Schwarzbaum testified that he invested his money in the manner suggested by his father and trusted the Swiss bankers to effectuate his wishes. He testified further that he signed the documents where they were marked by the bankers. While he looked at the documents before signing them, the USA presented no evidence that would lead to the conclusion that Schwarzbaum otherwise comprehended the tax or legal consequences of signing the documents where they were marked by the bankers. Moreover, despite the use of pseudonyms associated with his Swiss bank accounts, Schwarzbaum opened the accounts using his own name. Furthermore, he utilized his American passport to open several accounts, and explained that when he used his German passport instead, it was because his Swiss residency papers reflected his German, as opposed to American, citizenship. Similarly, Schwarzbaum's decision to consult a Swiss lawyer with respect to the effect of the UBS letter does not evince an attempt to conceal his Swiss accounts. At the time he received the letter, Schwarzbaum was no longer a UBS account holder and testified that he was confused by the letter as a result. He relied

---

the best of his ability, but at trial he testified that did not see his 2008 return before it was filed electronically. Weitz testified at trial that his clients get a copy of the return without signature, and that the returns themselves are not signed, unless they are mailed into the government. There was no testimony or evidence in this case that Schwarzbaum's 2008 return was mailed to the IRS. In addition, Weitz testified that he did not remember if Schwarzbaum's tax returns were reviewed with him before they were filed.

on the advice of his Swiss attorney that the UBS letter did not apply to him, until it became clear that the letter would apply, at which point Schwarzbaum retained U.S. counsel to address his tax issues.

As a result, the Court finds that the USA has failed to establish by a preponderance of the evidence that Schwarzbaum knowingly violated the FBAR reporting requirements.

### B. Schwarzbaum exhibited willful blindness or recklessly violated the FBAR reporting requirements

Although the Court does not find that the USA has satisfied its burden of proving that Schwarzbaum knowingly violated the FBAR reporting requirements, the Court determines that a finding of recklessness or willful blindness in this case is supported by a preponderance of the evidence for tax years 2007, 2008 and 2009, but not for 2006.

### i.   2006 FBAR

Importantly, Schwarzbaum testified that he always used CPAs to prepare and file his tax returns and relied on their advice. In *United States v. Boyle*, 469 U.S. 241 (1985), the Supreme Court was presented with the issue of resolving whether a taxpayer's reliance on an attorney to prepare and file a tax return can constitute "reasonable cause" for the failure to timely file a required return. While there is no reasonable cause exception to the assessment of a willful penalty in the FBAR context, the Court finds the reasoning in *Boyle* to be persuasive in its analysis of whether Schwarzbaum's violations of the FBAR reporting requirement were willful. While the Supreme Court in *Boyle* found that the taxpayer's reliance on his lawyer with respect to filing deadlines was not reasonable, the Court noted that "[c]ourts have frequently held that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken." *Boyle*, 469 U.S. at 250 (collecting cases). The Supreme Court held that

> [w]hen an accountant or attorney *advises* a taxpayer on a matter of
> tax law, such as whether a liability exists, it is reasonable for the
> taxpayer to rely on that advice. Most taxpayers are not competent to
> discern error in the substantive advice of an accountant or attorney.
> To require the taxpayer to challenge the attorney [or accountant], to
> seek a 'second opinion,' or to try to monitor counsel on the
> provisions of the Code himself would nullify the very purpose of
> seeking the advice of a presumed expert in the first place. 'Ordinary
> business care and prudence' do not demand such actions.

*Id*. at 251 (internal citation omitted) (emphasis in original).

Schwarzbaum testified that, prior to the tax years at issue, he told Gordon about the gifts he received from his father, and that Gordon told Schwarzbaum that gifts from non-U.S. sources are not taxable. In addition, Schwarzbaum testified that he told Shaw in 2007 that he was receiving money from his wealthy family in Switzerland, and that she told him that gifts are not reportable unless there is a U.S. connection. The USA contends that Schwarzbaum's testimony in this regard is not credible because of inconsistencies between his deposition testimony and trial testimony—he never discussed the FBAR with Shaw, he claimed at deposition that he could not recall entirely whether Shaw told him that everything with a U.S. connection had to be reported, and that he initially testified that Gordon gave him the U.S. connection advice, but then conceded that Gordon did not know about his foreign accounts. However, the Court does not find these purported inconsistencies to be decisive. The USA presented no evidence that any of Schwarzbaum's foreign bank accounts had a U.S. connection during tax year 2006, as Schwarzbaum believed from the accountants' advice was required. In fact, based upon Shaw's advice (albeit incorrect), Schwarzbaum disclosed the Scotiabank 1472 account, which was reported on his 2006 return precisely because funds were transferred to that account from the U.S. *See* Pl.'s Exhs. 4, 15. In addition, Shaw filed a Form 3520 reporting a gift of $184,000.00 Schwarzbaum received from his father. *See* Pl.'s Exh. 33. Schwarzbaum also testified that he learned of the FBAR and Schedule B

for the first time for tax year 2006 when Shaw was his accountant. Moreover, the relevant bank records support Schwarzbaum's contention that, based on his accountants' advice, he reported accounts that had a U.S. connection. Furthermore, the evidence did not reveal any bank documents from 2006 that reflected transfers to or from the U.S. to or from an account abroad that was not disclosed. This evidence would have easily refuted Schwarzbaum's testimony regarding the advice his accountants gave him. *See* Pl.'s Exhs. 60, 62, 67, 69, 71, 80, 89, 91, 93. As a result, the USA has failed to establish by a preponderance of the evidence that Schwarzbaum's violation of the FBAR requirement for 2006 was willful.

### ii. 2007-2009 FBARs

Even though the Court finds that Schwarzbaum was entitled to rely on his accountants' advice with respect to the filing of his 2006 FBAR, after 2006, Schwarzbaum could no longer reasonably rely on such advice, such that his violations thereafter may be properly viewed as non-willful. In pertinent part, although Schwarzbaum testified that his English at the time was more limited, he admitted that he never hired someone to translate documents for him and that he never signed documents in English without knowing what they said. Nevertheless, he self-prepared his 2007 and 2009 FBARs, and at least for 2007, he reviewed the instructions for the FBAR form. As such, by tax year 2007, Schwarzbaum was aware, or should have been aware, of the FBAR requirements.

The instructions for the FBAR form state as follows:

> **Who Must File this Report**[.] Each Unites States person, who has a financial interest in or signature authority, or other authority over any financial accounts, including bank, securities, or other types of financial accounts in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing TD F 90-22.1 with the Department of the Treasury on or before June 30, of the succeeding year.

Pl.'s Exh. 24. Schwarzbaum admitted that nowhere in the FBAR instructions was there language requiring a U.S. connection. As such, his professed continued ignorance with respect to the FBAR filing or disclosure requirement and reliance on his accountants' advice are not tenable. Moreover, the Court is not persuaded by Schwarzbaum's reliance upon his experience with other tax systems, in which taxation is based upon residency rather than citizenship, because the FBAR instructions are unequivocal about their application:

> **General Definitions**
>
> **United States Person**[.] The term United States person means (1) a citizen or resident of the United States, (2) a domestic partnership,(3) a domestic corporation, or (4) a domestic estate or trust.
>
> **Financial Account**[.] Generally includes any bank, securities, securities derivatives or other financial instruments accounts. Such accounts generally also encompass any accounts in which the assets are held in a commingled fund, and the account owner holds an equity interest in the fund. The term also means any savings, demand, checking, deposit, time deposit, or any other account maintained with a financial institution or other person engaged in the business of a financial institution.
>
> **Account in a Foreign Country**[.] A foreign country includes all geographical areas located outside the United States, Guam, Puerto Rico, and the Virgin Islands.
>
> **Financial Interest**[.] A financial interest in a bank, securities, or other financial account in a foreign country means an interest described in either of the following two paragraphs:
> (1) A United States person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his or her own benefit or for the benefit of others including non-United States persons. If an account is maintained in the name of two persons jointly, or if several persons each own a partial interest in an account, each of those United States persons has a financial interest in that account.
> (2) A United States person has a financial interest in each bank, securities, or other financial account in a foreign country for which the owner of record or holder of legal title is: (a) a person acting as

> an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person; (b) a corporation in which the United States person owns directly or indirectly more than 50 percent of the total value of shares of stock; (c) a partnership in which the United States person owns an interest in more than 50 percent of the profits (distributive share of income); or (d) a trust in which the United States person either has a present beneficial interest in more than 50 percent of the assets or from which such person receives more than 50 percent of the current income.
>
> **Signature or Other Authority Over an Account**[.] A person has signature authority over an account if such person can control the disposition of money or other property in it by delivery of a document containing his or her signature (or his or her signature and that of one or more other persons) to the bank or other person with whom the account is maintained. Other authority exists in a person who can exercise comparable power over an account by direct communication to the bank or other person with whom the account is maintained, either orally or by some other means.

Pl's. Exh. 24. As a result, after reviewing the FBAR instructions in connection with his 2007 FBAR, Schwarzbaum was aware, or should have been aware, of a high probability of tax liability with respect to his unreported accounts. Schwarzbaum did not take any steps to learn about those requirements or inform his accountants. Although none of Schwarzbaum's accountants asked him about foreign accounts, Schwarzbaum never disclosed his interest in any of the Swiss accounts to his accountants for tax years 2007 through 2009, despite the fact that the bulk of his personal wealth was held in those accounts.

Accordingly, the Court finds that Schwarzbaum's FBAR violations for tax years 2007, 2008, and 2009 were willful.

**C. The penalties assessed violate 31 U.S.C. § 5321**

Schwarzbaum argues that even if the Court finds that Schwarzbaum's violations were willful for one or more of the years at issue, the penalties assessed by the USA were arbitrary and capricious and must be set aside under the Administrative Procedure Act ("APA").[3]

Under the APA, a court may set aside agency actions, findings, and conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). This standard is "exceedingly deferential" to the agency. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). "To determine whether an agency decision [is] arbitrary or capricious, the reviewing court must consider whether the decision [is] based on a consideration of the relevant factors and whether there ha[s] been a clear error of judgment." *Id.* (quoting *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989). Examples of arbitrary or capricious agency decisions include those where an agency considers material "Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. Similarly, "'[t]he substantial evidence standard limits the

---

[3] Schwarzbaum appears to argue further that the IRS's determination that his FBAR violations were willful is subject to APA review because, in pertinent part, the same facts used by the IRS to determine that his violations were initially non-willful were the same facts used to ultimately reach the decision that the violations were willful. This argument conflicts with the Court's prior determination that its review of the willfulness determination is *de novo* and without regard to the factual and legal analysis used by the IRS at the administrative level. *See Rubenstein v. United States*, 826 F. Supp. 448, 453 (S.D. Fla. 1993), *aff'd* 103 F.3d 147 (11th Cir. 1996). Accordingly, the Court does not review the willfulness finding under the APA.

reviewing court from deciding the facts anew, making credibility determinations, or re-weighing the evidence.'" *DeKalb Cty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1020 (11th Cir. 2016) (quoting *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1133 (11th Cir. 2012)). "Substantial evidence . . . 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Under this standard, a court may "'reverse such findings only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough." *Id.* (quoting *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1304 (11th Cir. 2015)). "Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Ala. Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Schwarzbaum contends that the IRS failed to exercise its discretion in a reasoned manner in its calculation of the FBAR penalties because its methodology was not based on any year-by-year determination, as required by statute. In response, the USA argues that the penalty calculation was proper because the IRS made a willfulness determination, computed the statutory cap, and then exercised its discretion to mitigate the penalties further in accordance with the IRM. Upon review of the evidence, the Court finds that the base amounts used by the IRS in conducting the penalty calculation were not in accordance with the statute.

According to the applicable statute, the penalty assessed for a willful violation is the greater of $100,000.00 or "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account," 50% of "the balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii).

In reaching the penalty amount assessed against Schwarzbaum, the IRS in its correspondence with Schwarzbaum, asserted that it used the balance in each account as of June 30 of each relevant tax year 2006 through 2009 to arrive at a mitigated willful FBAR penalty amount of $35,729,591.00. *See* Pl.'s Exh. 48. The IRS considered that this amount was excessive, and further reduced the mitigated penalty to $13,729,591.00, which represents the maximum penalty for 2008 divided and spread over the years 2006 through 2009. *Id*. As a result, the penalty assessed for 2006 was $1,173,778.00,[4] and $4,185,271.00 each for tax years 2007 through 2009. *Id*. However, the evidence adduced at trial conflicts with the IRS's representation that it utilized the account balances as of June 30 of each tax year. At trial, Anderson testified that he approved the FBAR penalties assessed, which were based on amounts in the penalty calculation worksheet provided by Schwarzbaum during the course of the OVDI proceeding. In connection with his OVDI disclosures, Schwarzbaum reported the highest aggregate balance in each account for each year, not the balance in the account as of June 30 of each year. *See* Pl.'s Exh. 26; Jt. Exh. 11. As a result, notwithstanding any further mitigation applied by the IRS, the IRS used the incorrect base amounts to calculate the FBAR penalties in this case. The statute is clear that the amount to be assessed is 50% of the balance in the account at the time of the violation. The evidence in this case reflects that the IRS used the highest aggregate balance for each account as reported by Schwarzbaum on his OVDI penalty worksheet, instead of determining the balance in each account at the time of the FBAR violation, as required by statute. As a result, the IRS's penalty assessments for tax years 2007 through 2009 are not in accordance with law.

**D. Eighth Amendment claim**

---

[4] As the Court has determined that Schwarzbaum's violation for tax year 2006 was non-willful, Schwarzbaum may only be assessed a non-willful penalty for tax year 2006 in accordance with 31 U.S.C. § 5321(a)(5)(B)(i), which states that "the amount of any civil penalty imposed . . . shall not exceed $10,000."

Finally, Schwarzbaum contends that the FBAR penalties are subject to the Eighth Amendment and that the amounts assessed in this case violate the Eighth Amendment. Indeed, Schwarzbaum contends that it is not "the statute itself [31 U.S.C. § 5321(a)(5)] that must be struck down as unconstitutional, but the IRS's interpretation and application of the statute and the resulting $15.6 million assessment." *See* ECF No. [83] at 49. To the extent that the Court has already found that the FBAR penalty calculation in this case does not comply with the statute, Schwarzbaum's constitutional claim may be rendered moot as a result. In any event, the Court does not consider Schwarzbaum's Eighth Amendment claim at this juncture and recognizes that it may require consideration following a recalculation of the applicable penalties in accordance with 31 U.S.C. § 5321(a)(5).

## IV.    CONCLUSION

Accordingly, and for the foregoing reasons, the Court finds that Schwarzbaum's FBAR violation for tax year 2006 was non-willful, and therefore that the USA may only recover a non-willful FBAR penalty with respect to tax year 2006. In addition, the Court finds that Schwarzbaum's FBAR violations for tax years 2007, 2008, and 2009 were willful, but that the IRS's calculation of the applicable penalties does not comply with 31 U.S.C. § 5321(a)(5).

To assist the Court, the parties are directed to submit supplemental briefing with respect to the new proposed amount of penalties to be assessed against Schwarzbaum for a non-willful FBAR violation in tax year 2006, and willful FBAR penalties for tax years 2007, 2008, and 2009. The briefs shall be filed **no later than April 24, 2020**. The parties are to confer **no later than April 13, 2020,** in an effort to resolve the outstanding amount owed, given the Court's findings of fact and conclusions of law. The parties shall promptly inform the Court if the parties are able to reach an agreement as to the applicable amount of penalties owed.

Case No. 18-cv-81147-BLOOM/Reinhart

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 20, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record